IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 1:09-CR-241-WSD |
| MOUSSA BARADJI, MAMADOU SADIO | : | |
| BARRY, AMADOU DIALLO, | : | |
| IBRAHIM DIALLO, | : | |
| SEDIKEY SANKANO | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by Sally Quillian Yates, United States Attorney, Brian M. Pearce, Assistant United States Attorney for the Northern District of Georgia, and John Zacaharia, Senior Counsel, Computer Crimes and Intellectual Property Section, United States Department of Justice, and submits the following with respect to the sentencing of defendants Ibrahim Diallo, Mamadou Sadio Barry, Moussa Baradji, Amadou Diallo and Sedikey Sankano:

I.   STATEMENT OF THE CASE

On May 15, 2009, a federal grand jury returned an indictment charging thirteen defendants with conspiracy to violate federal trademark, counterfeit labels, and copyright laws.  Doc. 1 at 2-11.  Several defendants, including Sadio Barry and Moussa Baradji, were also indicted on substantive

charges under the federal copyright statute, 18 U.S.C. section 2319. [Doc. 1]. Four materials suppliers were indicted, along with nine defendants suspected of being large-scale counterfeiters of DVD movies and music CDs. The counterfeiting defendants were chosen for prosecution from a much larger number of Ahn customers based mainly on the frequency of their observed visits to the Ahns and the volume of their known, recorded purchases, together with other factors such as criminal history, ability to identify and known distribution activity.

The five defendants named above were all disc counterfeiters. Three of them pled guilty. The first to do so was Ibrahim Diallo, who on September 1, 2009 pled guilty to Count One, Conspiracy, pursuant to a plea agreement. Doc. 207. On December 10, 2009, Sedikey Sankano also pled guilty to Count One with a plea agreement. Doc. 233. On February 24, 2010, Amadou Diallo pled guilty to the same count under a plea agreement. Doc. 255. Sadio Barry and Moussa Baradji were convicted at trial on October 6, 2010. Doc. 366.

In the week of February 22, 2011, separate sentencing hearings are scheduled for the above-named six defendants in the above-captioned case, together with Scott Ahn, who also pled guilty to conspiracy, and Won Ahn, who pled guilty to a criminal information in a related matter. One convicted counterfeiting

defendant, Mamadou Simakha, is a fugitive and will be sentenced at a later date.

## II. STATEMENT OF FACTS

### A.  The Ahns

Beginning in or around early 2008, defendants Scott and Won Ahn opened a store on Metropolitan Avenue to cater to the large community of disc counterfeiters operating out of the Metropolitan Warehouses across the street.  TR 761.  In 2005, the Ahns had a similar business inside the warehouses but moved out after a spate of robberies.  TR 758-759.  From their store at 666 Metropolitan Avenue, they sold blank CD-R and DVD-Rs by the box full, in combination with DVD and CD cases.  TR 764-65. One CD "combo" consisted of 600 blank CD-Rs and three boxes of CD jewel cases, 200 cases to a box.  TR 764-65.  The Ahns sold CD combos for between $20 and $35 dollars apiece, depending on fluctuations in market price.  TR 767.  One DVD "combo" included a box of 600 blank DVD-Rs and six boxes of the cases, 100 cases to a box.  The 600 discs inside a box would be arranged on spindles, with 50 discs to a spindle.  TR 802.  The Ahns sold DVD combos for $25 to $30 apiece.  TR 767.

The Ahns sold to the same customers CD/DVD duplicator equipment of the sort exemplified by Government Trial Exhibits 281 and 282, which contained multiple trays for burning several

copies of the same master disc at the same time. TR 766.
Prices ranged from $550 to $1,000 per duplicator. TR 769. The
Ahns also fixed duplicating towers for their customers,
sometimes under a limited warranty. TR 768. They generally
opened around 5:00 p.m. and closed at 9:00 or 10:00 at night.
TR 761. They did not put up a sign advertising their store and
Scott Ahn did not believe one was necessary to attract customers
to that location. TR 771. They did not give receipts to the
customers at the Metropolitan Avenue store and took payment in
cash only. TR 772-73.

The Ahns had around 25 to 30 customers at the Metropolitan
Avenue store, though some came infrequently. TR 775. The Ahns'
larger customers would come five or six times per week. TR 775.
When busy, these customers would buy as many as seven to ten
combos at a time. TR 775. A medium customer would typically
come to the store three to four times per week and might buy two
to five combos per visit. TR 774. Their customers spoke to
each other at the Ahns' store, in French, English or African
languages. TR 775. The Ahns helped load boxes onto carts and
into their customers' vehicles. TR 777.

The Ahns typically worked in shifts. TR 813. Won Ahn
would report to his son Scott which customers had stopped by
during the father's shifts. TR 815. Scott Ahn discussed with

4

his customers how their mutual businesses were going, in part to learn whether his customers were also buying from competitors. TR 834.

In 2008, FBI agents began conducting surveillance at the Ahns' store. The Ahns moved twice within the same building, once around July 2008 and again in early 2009. TR 249. The case agent was familiar with disc counterfeiting in the warehouses from the FBI's execution of a search warrant there in 2004 and at six different units in 2006, in addition to warrants executed by local police departments. TR 257. They took video footage by hand held cameras and also set up pole cameras. TR 258. The first camera was trained on the Ahns' store. From this surveillance, the FBI determined that many of the Ahns' customers were also going across the street to Unit B-10-E inside the warehouses. TR 257. In August 2008, a second pole camera was installed there. TR 258. A smaller number of customers were found to be going to another unit inside the warehouses, Unit 2022. No camera was installed there, in part because the main focus was on B-10-E and in part because there was no ideal location for pole camera directed at that unit. TR 258. The agents instead made spot checks of Unit 2022 and took video footage from inside an unmarked van. TR 257-58. They began documenting information about the Ahns' customers,

5

including when they came and went, what they drove and did, and how many boxes they bought.  TR 264.  In addition to hours and hours of videotape, the agents took snapshots of the customers' faces, cars and picked up boxes when they could.  TR 268.

   B.  Moussa Baradji

   The FBI first encountered Moussa Baradji in the Metropolitan Warehouses on December 7, 2006.  TR 915.  On that date, teams of FBI agents executed search warrants at several units inside the warehouses where counterfeit CD/DVD stores and production sites were expected to be.  TR 915-16.  Moussa Baradji was one of six men who came running out of Unit 6021 as the search teams approached in their unmarked vehicles.  TR 918-19.  Special Agent Gerry Reichard and his team found many shelves of counterfeit DVDs and CDs in two apparent stores inside Unit 6021, and seized 23 boxes of copyright infringing materials.  TR 922.  Agent Reichard interviewed Moussa Baradji, who claimed he worked at the airport and that he was only there to buy discs, but had not yet done so.  TR 926.

   When the FBI began conducting surveillance of the Ahns' store in 2008, Moussa Baradji was one of the regular customers they began seeing there.  TR 265.  In late July 2008, after identifying Unit 2022 as one of the two warehouse units where Ahns' customers typically went, surveillance teams began

videotaping Baradji on their spot checks there.   The agents often had one team watching the Ahns and communicating the movements of customers to a second team posted near Unit 2022. TR 271-72.   Between July 2008 and the search of Unit 2022 in November 2008, Baradji was videotaped unloading boxes and black bags from his car and taking them into the unit.   TR 266, 289, 294.   Sometimes he did so at or around the same time as codefendant Amadou Diallo, who also had a burner room inside Unit 2022.   Baradji's activity at Unit 2022 also overlapped considerably with that of codefendants Oumar Diallo and unindicted coconspirator Sulaiman Diallo, whose vehicles were seen parked in front of the unit during most spot checks.   TR 290.

Like Oumar Diallo and Amadou Diallo, Moussa Baradji was questioned at Unit 2022 when the FBI executed a search warrant there on November 8, 2008.   TR 149.   He admitted to Agent McGroarty that he had been questioned by the FBI before inside the warehouses.   TR 149.   Baradji said that he was only visiting the warehouses on that prior occasion in 2006, but admitted that he was currently selling counterfeit CDs and DVDs.   TR 149. Baradji stated that he did so at flea markets in Georgia and perhaps out of state, and that his selling price was $5.   TR 149.   At first Baradji claimed that he was buying finished

product from "Dudu" in the West End, that he was only at Unit 2022 that evening to pick up a friend, and that he had only been there twice before.  TR 350. Agent McGroarty then showed Baradji surveillance photographs made from video footage of Baradji at Unit 2022.  TR 354.  Baradji then admitted that he had a burner room inside the unit, and that it was the smaller of the two upstairs rooms.  TR 351.  The search team found three burners in that room and boxes of finished product.  TR 343-45; Gov. Ex. 84-87.

After Unit 2022 went out of business in November 2008, the FBI continued to see Baradji at the Ahns.  TR 362.  As late as January 22, 2009 (around the time the Ahns closed the store), the FBI saw Moussa Baradji continuing to pick up blank discs and other supplies from 666 Metropolitan Avenue.  TR 366.  They also videotaped him picking up duplicating towers from the Ahns in November and December 2009, in an apparent effort to retool after the seizure of the towers he had in his burner room in Unit 2022.  TR 362-64.  The FBI attempted to make an undercover buy from Baradji at his suspected store at 2945 Stone Hogan Connector in southwest Atlanta, but their source did not succeed in completing a buy.  TR 366-67.  Scott Ahn testified that Moussa Baradji was one of the his "medium-size" customers at the Metropolitan Avenue store  TR 777.  He bought DVD and CD combos

8

from the Ahns three or four times per week.  Id.  Ahn recalled that on average, Baradji bought around equal numbers of DVDs and CDs, though on a given night he might buy more of one than the other.  TR 778.  He usually bought around three to four DVD combos, and a like number of CD combos per visit.  Id.  As with other customers, Ahn sometimes noticed finished CDs and DVDs in Baradji's vehicle.  TR 778-79.  Scott Ahn recalled that his father helped Moussa Baradji buy his green Subaru at an auction, and that Baradji may also have used their duplicator repair service.  TR 780-81.  In the months when the pole camera at the Ahns was fully operable, he can be seen picking up boxes of blank discs there several times per week and sometimes in streaks of several days in a row.  Exhibit 2.  Between March 1, 2008 and December 22, 2008, Baradji and Bah, the proprietor of Unit B-10-E, spoke with one another 20 times by telephone. Exhibit 1.

C. <u>Sadio Barry</u>

In December 2004, Sadio Barry was first interviewed about music and movie piracy at a flea market off 1955 Campbellton Road in Atlanta.  TR 375-76.  On that day, the Atlanta Police Department executed a search warrant there and seized around 100,000 counterfeit discs.  TR 367, 378. Special Agent McGroarty identified himself as an FBI agent and talked briefly with Barry

inside Room No. 7, one of the several stores into which the building was divided with plywood partitions. TR 376. Barry was not arrested. TR 377. Barry admitted to running a counterfeit disc store. TR 378. He said that his inventory came from New York by Greyhound bus, and that he sometimes exchanged titles with other vendors as needed. TR 378.

In 2008, Agent McGroarty began seeing Sadio Barry again at the Ahns' store on Metropolitan Avenue. TR 379. On a spot check on February 13, 2008, Agent McGroarty saw Barry shopping there in his black Acura MDX. TR 381. When the pace of surveillance picked up in May 2008, FBI agents again saw Barry there, either in the Acura or a burgundy Toyota Siena, both registered to him. TR 383-86. Through pole camera and other surveillance, the FBI identified Sadio Barry as one of the Ahns' largest and most frequent customers in 2008 and early 2009. TR 387-391, 407-09. Further surveillance showed that Barry was also a frequent visitor of Unit B-10-E/3093. TR 391-92. The FBI took extensive video footage of Barry at both places loading CD/DVD boxes into his two SUVs and wearing his distinctive rectangular framed glasses. TR 384-92. Barry also picked up duplicator towers from the Ahns, including on two occasions videotaped on January 10 and January 20, 2009. TR 408.

Among many other visits documented at trial, Barry was at Unit B-10-E when the FBI executed a search warrant there on January 9, 2009.   TR 392.   When the search began, one of his vehicles was out front with its hatch open and boxes of blank discs just bought at the Ahns visible in the back.   TR 392. Tall stacks of broken down DVD and CD boxes were found inside the unit, along with commercial photocopiers, multi-tray duplicator towers and box upon box of finished product similar to what had been found at Unit 2022.   TR 396-400.   FBI agents questioned Barry but did not arrest him.   TR 404.   He admitted to Agent McGroarty that he was dropping off blanks just bought at the Ahns, and that he had been buying from them for several months.   TR 404.   Barry admitted to selling counterfeit discs. TR 404.   Evidently trying to hide his store, Barry claimed that he sold discs from out of his vehicle. TR 404.   Barry said that Alpha Bah was his artwork supplier and that he paid another man to burn the discs for him at the unit.   TR 406.   Barry discussed with Agent McGroarty in detail the prices charged by the Ahns for CD and DVD combos.   TR 406-07.

Shortly after this encounter at Unit B-10-E, Agent McGroarty met Sadio Barry a third time during a search of a disc counterfeiting site in Atlanta.   TR 413.   The agent accompanied Atlanta police officers who were executing a search warrant at

S&S Clothing.   TR 410.   As officers entered the front door, Barry came running out the back and was stopped.   TR 411.   After confirming that Barry was not being arrested, Agent McGroarty interviewed him.   TR 414.   Barry admitted that one of the S's in "S&S" stood for "Sadio" and that he shared the store with a partner named "Samson".   TR 416.   Barry took responsibility for the counterfeit disc side of the business, but said the clothing was mostly Samson's.   TR 416.   Thousands of counterfeit music CDs and DVD movies were seized, along with a duplicating tower. TR 416.   Barry admitted that he sometimes used the burner to make titles specially requested by customers, but said that he was buying most of his inventory already finished.   TR 415-16.

Scott Ahn identified Mamadou Sadio Barry as a customer who came to his Metropolitan Avenue store five times per week on average.   TR 785.   On a typical night Barry bought five DVD combos and a similar number of CD combos, though the split between CDs and DVDs might vary between summer and winter.   Id. Scott Ahn and Sadio Barry sometimes spoke by telephone, and Ahn was able to persuade Barry to switch suppliers.   TR 785.   Scott Ahn recalled that Sadio Barry sometimes seemed to be working in "partnership" with others, including "Charles" and perhaps with another "gentleman" whose name he could not recall.   TR 816, 835.

Toll records showed that Barry and Bah called one another 593 times between March and December 2008. Exhibit 1. Judging from the ledger found in Bah's copier room and introduced at trial, Barry was Bah's largest customer by far. Govt. Trial Exhibit (Tr. Ex.) 292.

D. _Sedikey Sankano_

Sankano pled guilty to Count One (conspiracy) in this case in light of an abundance of evidence. This evidence included undercover buys from Sankano at his Lee Street store, surveillance of him buying raw materials at both the Ahns and Unit #B-10-E, a ledger found at Unit B-10-E, and identifications by other counterfeiters.

Like several of his codefendants, the FBI identified Sedikey Sankano as a customer of the Ahns' blank media business on Metropolitan Avenue through surveillance and interviews. TR 680. Scott Ahn remembered him as being a "small to medium" customer who drove an SUV. TR 790. In 2008, FBI agents recorded him routinely picking up supplies at the Ahns and doing business at Unit B-10-E. TR 431. A notebook found during the raid at unit #3093/#B-10-E showed that 'Sidi' and 'Sidiki' made frequent purchases from the warehouse. Govt. Tr. Ex. 292. Several persons interviewed on site during the raid identified Sankano from photographs.

13

Unlike Sadio Barry, Sankano was not present at Unit B-10-E during the FBI's search there on January 9, 2009.   He was identified as a customer of the unit by employees and customers there, however.   One admitted customer identified Sankano as a fellow customer who usually arrived in an SUV driven by a woman. Another admitted customer and seller of counterfeit discs said that he calls Sankano "Uncle" and has seen him in the copier room where the artwork is made.   Co-defendant Sadio Barry said that he had met Sankano there before and seen him getting artwork from the copier room in the unit.   Sankano and Alpha Bah called one another 140 times between March and December 2008. Exhibit 1.

    E.   Amadou Diallo

Amadou Diallo pled guilty to Count One, the conspiracy count, in the face of evidence of three undercover buys from him, extensive surveillance of him picking up supplies at the Ahns and dropping them off at Unit 2022 or B-10-E ((TR 267-70, 290, 292, 304-05, 309-11), his presence and admissions at Unit #2022 during the November 2008 raid there, surveillance of him carrying a duplicating tower into Unit #B-10-E after Unit #2022 was raided, and identifications of him by other disc counterfeiters.

Before this investigation began, Diallo had two prior arrests involving movie and music piracy.   On April 22, 2005, Atlanta police arrested Diallo for Reproduction of Recorded Material.   On May 5, 2007, he was arrested on the same charge by Fulton County police. PSR (Amadou Diallo) at 23.

Diallo mainly drove a silver Chrysler 300 registered to someone else.   TR 267.   Beginning in July 2008, he was observed and videotaped several times loading boxes into his car at the Ahns and then driving to Unit #2022 at the Metropolitan warehouses.   One recording shows 'DVD-R-4X' on the boxes.   On another day he was seen opening the unit with a key.

Amadou Diallo's store was found through surveillance to be fronted by a hair salon at 1140 Ralph David Abernathy Boulevard. On September 19, 2008, Diallo sold a confidential witness 24 DVDs and 14 CDs at his store.   One week later the confidential witness  made a recorded call to Diallo and made a videotaped, tape-recorded buy of 8 CDs and 28 DVDs at the store.   Three weeks later, the CW made a third videotaped buy (20 CDs and 20 DVDs) from Diallo at a different store on Martin Luther King Drive.

During the raid on Unit #2022 on November 13, 2008, Diallo was found on site with several hundred blank discs in his possession.   Diallo was not arrested but was interviewed.   He

claimed that he was only dropping off blank CDs for a friend. He identified his supplier as an 'old Chinese man' across the street.  Diallo claimed that he had stopped selling counterfeit discs and now only sold clothes.  The mobile number Diallo provided to the agents matched the one he gave to the CW during the first buy.  A younger man, an apparent worker in the unit, was also interviewed on site.  He identified Diallo as someone who paid him to make counterfeit DVDs ($15 per case) and CDs ($20 per case) at part time and the owner of several burners in Unit 2022.

After the raid on Unit #2022, Amadou Diallo continued to sell counterfeit discs but shifted his manufacturing to Unit #B-10-E/#3093.  Four days after the raid on Unit #2022, Diallo was observed carrying a duplicating tower into Unit #B-10-E.  On December 5, 2008, the confidential witness made a recorded buy (29 DVDs, 7 CDs) from Diallo at a store off Campbellton Road in Atlanta.  On December 22, 2008, Diallo was seen unloading boxes at Unit #B-10-E/#3093.  During the raid on that unit two weeks later, Muhamadou Batchilly identified Diallo as someone he recognized from the copier room in the unit.  At trial, Scott Ahn remembered Diallo as a customer who fluctuated between being a "medium" and a "big" one, whom he knew as "Dee".  TR 790-91.

Between March 1, 2008 and December 22, 2008, Amadou Diallo and Bah called one another 163 times.  Exhibit 1.

    F.  Ibrahim Diallo

Ibrahim Diallo was the first defendant in this case to enter a guilty plea.  Doc. 207.  He pled guilty to Count One (Conspiracy) in view of evidence which included: three undercover buys from him at 639 Dill Avenue, Atlanta, in September and October 2008; Diallo's presence and admissions at the barbershop/counterfeit disc store there in October 2008; their handyman's identification of Diallo and Charles Ndhlovu (also present during the search) as the two operators of the counterfeit disc store below the barbershop; the large number of counterfeit discs found and seized at the store; and video surveillance of partner Ndhlovu picking up blank the Ahns and then apparently picking up artwork at Unit #B-10-E.

On September 8, 2008, Diallo led a confidential witness to the back of the barbershop and sold him 24 counterfeit discs (both CDs and DVDs).  Calling himself "Ten Ten", Diallo stated that it was his store and provided telephone number 404-573-0925.  The purchase was recorded with audio and video.  Ndhlovu was not present at the buy.  He was seen the next day arriving at the Metropolitan warehouses in his white Jeep Cherokee and entering at unit #B-10-E.

On October 7, 2008, the same confidential witness set up a second buy of counterfeit discs from Diallo at the barbershop and bought 15 CDs and 36 DVDs.  The call was recorded but the buy was not.

On October 21, 2008, Atlanta police executed a search warrant at Ndhlovu and Diallo's store and seized 2,906 counterfeit DVDs and 2,250 CDs.  Diallo was arrested, but Ndhlovu was not.  Ndhlovu admitted to a prior arrest for buying counterfeit discs but claimed he was only there to buy discs. Diallo waived his rights and claimed that he was at the barbershop for a haircut, though he admitted to having sold discs there once or twice.  At the time, Diallo claimed he had done so for a friend, "Joe."  The handyman in the store at the time said that Ndhlovu and Diallo ran the store together, and that Ndhlovu, who evidently handled the supply side, had just brought something into the store from his white SUV outside. The handyman said that he had made the partitions for the downstairs counterfeit disc store, and that either Diallo or Ndhlovu would typically man the store while the other one positioned himself upstairs in the street-level barbershop.

During the raid on #B-10-E on January 7, 2009, an admitted seller of counterfeit discs, Muhamadou Batchilly, identified Ndhlovu as 'Soul' and as someone who 'used to' sell counterfeit

discs.   Between   March 1 and December 22, 2008,   Ndhlovu spoke
with his paper supplier, Bah, 66 times.   Ahn identified Charles
as the driver of a white Grand Cherokee.   TR 791.   He was an
"average" customer who, like other customers, did not need an
appointment to pick up supplies from the Ahns.   Id.   Toll
records showed that Ndhlovu and Alpha Bah called one another 63
times between March 1, 2008 and December 21, 2008.   Exhibit 1.

### III. SENTENCING RECOMMENDATIONS

The Government agrees with the U.S. Probation Office's
recommendations in large part.   The Government's loss
calculations are somewhat lower for some defendants because of
its stipulation to a lower value per counterfeit disc, as
discussed further below and in its objections to the Probation
Office's Sentencing Reports.   Its recommendations on the
adjusted offense levels for defendants Ibrahim Diallo, Amadou
Diallo and Sedikey Sankano are also lower because the Government
does not recommend a 2-level upward adjustment for these
defendants under U.S.S.G. § 2B5.3(b)(2) ("work being prepared
for commercial distribution"). The reasons for these differences
in the Government's recommendations are set forth in its
Objections to the Presentence Report.

In this case, as in most high-volume copyright and
trademark infringement cases, the "infringement amount" is the

19

main determinant of the adjusted offense under U.S.S.G. § 2B5.3. Under Application Note 2, a determination is to be made about the number of infringing items and the value by which that number is to be multiplied, which in some cases is the retail value of the "infringed item" (*i.e.*, authentic item) and in other cases is the value of the "infringing item" (*i.e.*, pirated or counterfeit item). USSG § 2B5.3, application note 2. The value of the infringed item is to be used in cases such as this where the "infringing item . . . is digital or electronic reproduction of the infringed item." USSG § 2B5.3, application note 2(A)(i). In such cases, "[t]he infringement amount is the retail value of the <u>infringed item</u>, multiplied by the number of infringing items." USSG § 2B5.3, application note 2(A).

Section 2B5.3 does not require that the loss determination be based solely on the number of completed items seized, purchased undercover, or proved through similar forms of direct evidence to have been manufactured and/or distributed; rather, the sentencing court may extrapolate the number of infringing items from raw materials possessed by the actual or would-be infringer. See <u>United States v. Kim Tae Sung</u>, 51 F.3d 92 (7th Cir. 1995), <u>rev'd on other grounds by</u>, 114 F.3d 1192 (1997); <u>United States v. Guerra</u>, 293 F.3d 1294 (11th Cir. 2002) (citing <u>Sung</u> with approval in relevant part). Such extrapolation from

20

raw materials is proper under section 2B5.3 where there is a "reasonable certainty" that the defendant "came close to completing additional sales of the counterfeit good." Guerra, 293 F.3d at 1293; U.S.S.G. § 2B5.3, application note 2(E) ("In a case in which the Court cannot determine the number of infringing items, the court need only make a reasonable estimate of the infringment amount using any relevant information, including financial records.").

In Sung, the defendant was arrested with over 1,000 gallons of counterfeit hair care products, together with empty boxes and bottles. 51 F.3d at 93. The volume of liquid seized would have filled 17,600 bottles, but the district court based Sung's sentence on the number of empty bottles found. Id. "The district court treated Kim as accountable for 240,000 filled counterfeit bottles (20,000 cartons x 12 bottles per carton) and sentenced him to 48 months' imprisonment." Id. Judge Easterbrook noted that "[s]entencing under the Guidelines is not a duplicate of the calculation of damages in civil proceedings; the Guidelines often use rough-and-ready calculations to curtail complexity." Id. But the Guerra court nevertheless found the district court's calculations too rough in failing to consider whether the defendant had "any reasonable expectation of being able to sell that much counterfeit" product, versus perhaps

having "bought 20,000 cartons, fewer bottles, and still less liquid, because these were standard lots in the industry." Id.

In Guerra, Secret Service agents entered the defendant's print shop and found "Made in Cuba" printing plates, along with cigar foils stamped with counterfeit trademarks for Monte Cristo and other high-end cigars. 293 F.2d 1284. Defendant Ordonez admitted that he had been selling 4-5 boxes of counterfeit cigars a week (around 234 boxes total) for $40-$100 per box. Id. Ordonez was convicted at trial and sentenced to 27 months' custody. Id. In calculating the infringement amount, the district court extrapolated the number of infringing items from the number of labels seized, and multiplied that number by the price of the most expensive cigar imitated by the defendants ($4.00 per cigar). Id. at 1293.

In Guerra convictions of Ordonez and his cigar counterfeiting co-defendants were affirmed, but the case was remanded for resentencing. Id. at 1294. Citing Judge Easterbrook's opinion in Sung, the Eleventh Circuit found that the district court "erred in not making findings during sentencing as to: (1) how close the defendants came to completing additional sales; (2) whether there was a reasonable likelihood of generating revenue corresponding to the amounts assigned...." Id. The Guerra court noted that "[t]here is no

22

evidence in the record of other past shipments, thus, the court's total valuation of the infringing items may not be sustained on this record." Id.

As in Sung and Guerra, the Government's estimate of the number of infringing items is based on extrapolation from raw materials. Unlike in those cases, this estimate is reasonable because the Government had extensive data about the defendants' activities over an extended time.   In Guerra, the Eleventh Circuit found insufficient evidence that the thousands of counterfeit cigar bands seized from the defendants were reasonably likely to result in the "finished" article".   293 F.3d at 1294.   Had the evidence provided more than a mere snap shot of their activities, the Court indicated, the district court's extrapolations of the "finished article" from "components" would have been sustained.   Id. ("There is no evidence in the record of other past shipments, thus, the court's total valuation of the infringing items may not be sustained on the record.").

Here, in contrast, the record contains evidence of repeated past deliveries of "components" (i.e., the blank discs, cases, and sometimes duplicating towers) associated with each defendant.   As demonstrated in the attached surveillance spreadsheets, Exhibits 2-6, each of the counterfeiting

23

defendants being sentenced picked up raw materials again and
again over a span of several months (or in Ibrahim Diallo's
case, had someone else pick up raw materials for him).  These
previous pickups are analogous to the "record of other past
shipments" whose absence in Guerra led the Eleventh Circuit to
remand for resentencing.  That Baradji, Sankano, Sadio Barry,
Ibrahim Diallo and Amadou Diallo were continually replenishing
their inventory of blank discs, often several times in the same
week, establishes the "reasonable likelihood" of sales missing
before remand in Sung and Guerra.

The Government's method for extrapolating finished product
from raw materials (like the Probation Office's) begins with an
estimation of the number of boxes of discs each received from
the Ahns.  Exhibits 2-6.  As Agent McGroarty testified at trial,
the agents conducted surveillance in this investigation for
around one year, at the Ahns' store, inside the Metropolitan
Warehouses, at the targets' stores and/or residences and
elsewhere.  They conducted dozens of hours of surveillance in
person and reviewed extensive footage from the hundreds of hours
of footage taken.  As was apparent from Agent McGroarty's trial
testimony, the case agents became highly familiar with the Ahns'
regular customers, their vehicles, and appearance.  The
videotaped footage often showed the counterfeiting defendants'

24

faces and clothing in such detail that the agents began noticing when the targets wore a shirt or pair of pants two days in a row, as Agent McGroarty recalled at trial.

From this footage, the case agents kept surveillance logs recording date, time, vehicle and the number of boxes picked up (along with bags, spindles and duplicating towers).  For the counterfeiting defendants being sentenced, the case agents created separate tables listing each recorded visit to the Ahns and the approximate number of boxes visibly being loaded into the vehicle from the Ahns' store.  Exhibits 2-6.

The second step is to determine how many of these boxes likely contained discs--the main "infringing item" for purposes of USSG § 2B5.3--as opposed to cases for the discs.  Scott Ahn testified that each of his customers bought CDs and DVDs as part of a "combo."  A CD combo contained one box of 600 discs and 3 boxes of jewel cases, whereas a DVD combo included one box of 600 discs and 6 boxes of the large DVD covers.  From this testimony and similar accounts given by some of the Ahns' customers and co-defendants, it is clear that the number of boxes of discs picked up was only a fraction of the number of boxes recorded on videotape.  To estimate this fraction, the government assumed that each defendant being sentenced purchased

CDs and DVDs in equal numbers.[1]  See Sung, 51 F.3d at 93 (the
Guidelines often use rough-and-ready calculations to curtail
complexity.");  U.S.S.G. § 2B5.3, application note 2(E) ("In a
case in which the Court cannot determine the number of
infringing items, the court need only make a reasonable estimate
of the infringment amount using any relevant information,
including financial records."). If a counterfeiter purchased DVD
combos and CD combos in equal numbers, only two out of every
eleven boxes that he picked up from the Ahns would contains
discs on average--one box of CDs, one box of DVDs, 6 boxes of CD
jewel cases and 3 boxes of DVD covers. Therefore, for each
counterfeiting defendant, the government has multiplied the
number of boxes estimable from the surveillance footage by
2/11ths.  This number was then multiplied by 600 (discs were
sold in boxes of 600, whether DVDs or CDs) to obtain the total
number of infringing items (i.e., pirated discs).

---

[1]  This simplifying assumption was largely borne out by Scott
Ahns' testimony and other evidence.  Scott Ahn testified that
while his customers might buy more DVDs than CDs in one season,
the reverse would be true in other seasons, such that the
numbers generally evened out. TR 778. Of the many seizures and
buys made from the sentencing defendants in this case and prior
investigations, the number of CDs and DVDs was sometimes fairly
close (e.g., 2,906 DVDs and 2,250 CDs were seized from Ibrahim
Diallo and Charles Ndhlovu on October 21,2008). In some cases
significantly more DVDs were seized (e.g., 1,786 DVDs versus
1,013 CDs seized from Sedikey Sankano on October 28, 2008), while
in other instances the reverse was true (3,098 DVDs and 9,853 CDs
seized from Moussa Baradji on November 7, 2006).

This "discs on tape" method is conservative.   It counts no sales at the Ahns before the pole camera went up and no sales in the several weeks over the summer of 2008 when that pole camera was down for technical reasons.   For most if not all the counterfeiting defendants, a less conservative, considerably higher, but still arguably reasonable estimation could be obtained from the sum of Scott Ahn's testimony, the ledger found at the Bah's and footage at Unit B-10-E, supplemented for some defendants by their own admissions.   See U.S.S.G. § 2B5.3, application note 2(E) (the sentencing court may estimate the number of infringing items from financial records).   The government has also excluded from its calculations discs bought undercover or seized during the 2008-09 investigation, on the assumption that these discs have already been accounted for in the extrapolations from raw materials.

The Government's recommendations for the various defendants are explained separately below:

A.   Moussa Baradji

In the 2008-09 investigation of Units B-10-E and 2022, the FBI recorded Baradji's green Subaru Outback at the Ahns on 91 different occasions.   Exhibit 2.   Agent McGroarty became closely familiar with the appearance of Baradji and his car from surveillance of him both with the pole camera at the Ahns and

Bah's and with a handheld camera in a van at close range at Unit 2022.  Tr.  357-367.  In reviewing the footage of these 91 errands, Agent McGroarty has made his best efforts to discern from the footage the number of boxes being loaded from the Ahns' dolly into the car each evening.  The approximate number of boxes visible in footage of Baradji's Outback at the Ahns between May 9, 2008 and January 27, 2009 is 442 (together with 26 bags).  Exhibit 2.

Using the method of estimation discussed above, the Government arrived at a loss amount under U.S.S.G. § 2B1.1 as follows:

442 x 2/11 =80.36 boxes of discs

80 x 600 = 48,000 discs

48,000 x $11.30[1] = $542,400

This calculation does not include 3,098 DVDs and 9,853 CDs seized from Unit 6093 during the FBI's first search at the Metropolitan Warehouses in November 2006.  Nor does it include the around 35,000 counterfeit discs found by the Atlanta Police Department during a license check at Baradji's store on Stone Hogan Parkway at the beginning of 2009.  The discs in the 2006

---

[1]    The United States does not object to the Probation Office's use of a $16 average for retail price as to Defendant Baradji since he did not stipulate to a retail price pre-trial.  Using a $16 retail value yields an infringement amount $768,000, which does not result in any change to the total offense level calculation under the Guidelines.

seizure are not clearly attributable to Baradji; to count the discs from the 2009 seizure would probably be duplicative.

Plugging this infringement amount into U.S.S.G. § 2B5.3 results in the following recommendation:

   8

+14 (loss amount)

 +2 (work being prepared for commercial distribution)

 +2  (offense involving manufacturing)

 26

The Government agrees with Probation that Baradji's guideline range is 63-78 months. Because this is Baradji's first offense under the federal copyright statute, his sentence is capped at 60 months. 18 U.S.C. § 2319(b)(1). The Government recommends a sentence of 60 months.

   B.  Mamadou Sadio Barry

In 2008 and early 2009, the FBI counted 107 shopping visits by Sadio Barry to the Ahns in his burgundy Toyota Sienna and black Acura MDX. Exhibit 3. Sadio Barry's face and distinctive glasses are apparent in some of the footage. Tr. 375, 386. Agent McGroarty never saw what looked like someone else driving either vehicle. The approximate number of boxes visible in pole camera footage of Barry's vehicles at the Ahns between May 10, 2008 and January 28, 2009 is 811 (plus 21 bags).

The Government's recommended infringement amount for Sadio Barry is as follows:

811 x 2/11 = 147.45 boxes of discs

147.45 x 600 = 88,470 discs

88,470 x $11.30$^2$ = **$999,711**

This calculation does not include the thousands of counterfeit discs seized from S&S Clothing in early 2009.   The Atlanta Police Department's search there was soon after the last of Barry's pickups from the Ahns at the end of January 2009, so to include them would appear to be duplicative.

This infringement amount results in the following recommendation under U.S.S.G. § 2B5.3:

8

+14 (loss amount)

+2 (work being prepared for commercial distribution)

+2  (offense involving manufacturing)

26  (63-78 months)

Like Baradji, Barry does not have a prior offense for purposes of the statutory maximum under the federal copyright statute.   Therefore, his sentence is also capped at 60 months.

---

[2]   The United States does not object to the Probation Office's use of a $16 average for retail price as to Defendant Barry since he did not stipulate to a retail price pre-trial.  Using a $16 retail value yields an infringement amount $1,415,520, which change the total offense level calculation under the Guidelines from 26 to 28. However, as noted in the text, _infra_, either calculation exceeds the maximum sentence of five years.

18 U.S.C. § 2319(b)(1).  The Government recommends a sentence of 60 months.

### C.  Sedikey Sankano

The pole camera first recorded Sedikey Sankano at the Ahns 25 different times between September 10, 2008 and November 7, 2008. Exhibit 4.  Sankano was usually driven to the Ahns by a woman in a green Land Rover.  He is seen picking up around 123 boxes.

The Government's recommended infringement amount for Sedikey Sankano is as follows:

123 x 2/11 = 22.36 boxes of discs

22.36 x 600 = 13,416 discs

13,416 x $11.30 = **$151,600.80**

This calculation does not include 1,013 counterfeit CDs and 1,786 counterfeit DVDs seized from Sankano on October 28, 2008, or the much smaller number of discs purchased from him by a confidential informant earlier that month.  To count this completed product would appear to be duplicative.  The foregoing calculations already take into account blank discs picked up by Sankano in September and early October 2008.

Under the plea agreement, the Government's recommendation for Sedikey Sankano is as follows:

     8

+10 (loss amount)

 +2 (offense involving manufacturing and/or distribution)

 -3 (acceptance of responsibility)

 17  (24-30 months)

Pursuant to the plea agreement, the Government recommends a low end sentence of 24 months.

   D.  Amadou Diallo

Amadou Diallo appears in the pole camera footage shopping at the Ahns 51 different times between May 9, 2008 and January 6, 2009.  Exhibit 5.  He ran his errands in a variety of cars, including a Chrysler 300, a silver Dodge Intrepid and a black GMC Envoy.  Id.  The pole camera recorded Amadou Diallo picking up 252 boxes and 22 bags.

The Government's recommended infringement amount for Amadou Diallo (and recommended restitution amount in the plea agreement) is as follows:

230 x 2/11 = 41.81 boxes of discs

41.81 x 600 = 25,086 discs

25,086 x $11.30 = **$283,471**

Not counted here are the boxes of finished product seized from Diallo's upstairs burner room at Unit 2022 on November 8, 2008 or the smaller numbers purchased by a cooperating witness

in three different buys between September and December 2008.  To count these discs would be duplicative.  Under the plea agreement, the Government's recommendation for Amadou Diallo is as follows:

        8

    +12 (loss amount)

     +2 (offense involving manufacturing and/or distribution)

     -3 (acceptance of responsibility)

     19  (30-37 months)

    In accordance with the plea agreement, the Government recommends a low end sentence of 30 months.

    E.  Ibrahim Diallo

    Ibrahim Diallo has been found only once in the pole camera footage, and on that day was at Unit B-10-E, Bah's store, not the Ahns.  On September 9, 2009, he was videotaped there with his partner in the barbershop store at 639 Dill Avenue, Charles Ndhlovu.  Between June 13, 2008 and November 13, 2008, he was seen at the Ahns on 26 different errands picking up a total of 88 boxes and 13 bags.  Exhibit 6.

    Ibrahim Diallo was the first defendant to enter a guilty plea in this case.  Under the plea agreement, the government's sentencing recommendation is based on the number of boxes picked

up by Diallo's partner, Charles Ndhlovu, during the relevant period.

Pursuant to the plea agreement, the Government's recommended infringement amount for Ibrahim Diallo is as follows:

88 x 2/11 = 16 boxes of discs

16 x 600 = 9,600 discs

9,600 x $11.30 = **$108,480**

For the same reasons discussed above, this infringement amount does not include the 2,906 counterfeit DVDs and 2,250 counterfeit CDs seized from their barbershop store on October 21, 2008.  Nor does it include the smaller numbers of pirated discs sold by Diallo to a cooperating witness in the preceding weeks.

      8

+ 8 (loss amount)

 +2 (offense involving manufacturing and/or distribution)

 -3 (acceptance of responsibility)

 15 (18-24 months)

In accordance with the plea agreement, the Government recommends a low-end sentence of 18 months.

The Government does not agree with Ibrahim Diallo that he is entitled to a downward adjustment for minor role.  He has not

met his burden of showing that he was "less culpable than most other participants" and therefore entitled to a minor role adjustment.  U.S.S.G. § 3B1.2, application note 5.

As Diallo admitted in his plea colloquy, he sold counterfeit discs at the barbershop store while his partner Ndhlovu bought the raw materials.  9/1/09 Transcript at 36-37. In his Objections, Diallo asserts that he worked at the store only "periodically", but on the three different occasions when a confidential informant was sent into the barbershop store, it was Ibrahim Diallo who made the sales.  9/1/09 Transcript at 36-37. In objecting to the Probation Officer's calculations, Diallo further admits that he was also involved in "transporting raw materials (blanks and/or artwork) from suppliers to others responsible for the creation of counterfeit discs."  Ibrahim Diallo's Objections to Initial PSR at 4.

The gist of Diallo's role argument is that he was working for someone else at the store and not well paid.  Id.  When the Atlanta Police Department searched the store in October 2008, Diallo similarly claimed that he was working for "Joe". However, other claims he made at the time proved not to be true (e.g., that Ndhlovu was just a friend who sometimes gave him a ride).  A well-placed eyewitness, their handyman, identified

Ndhlovu and Diallo as partners who manned the store together. Id. at 37.  He did not mention "Joe" or any other third partner.

Ibrahim Diallo appears to have had an at least co-equal role at the barbershop store with his now admitted partner Ndhlovu. 9/1/09 Transcript at 36-37. No third participant has been proved up.  In any event, as the person evidently handling much of the crucial sales side of the business, and admittedly involved in the manufacturing process to some extent, Diallo was not less culpable than any other participant.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Government recommends that the defendants be sentenced as set forth above.

Respectfully submitted,

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

*S/Brian M. Pearce*

BRIAN M. PEARCE
ASSISTANT UNITED STATES ATTORNEY
600 U.S. Courthouse
75 Spring St., S.W.
Atlanta, GA  30303
Telephone (404)581-6217
Facsimile (404)581-6181
Georgia Bar No. 568768

JOHN H. ZACHARIA
Senior Counsel
U.S. Department of Justice
Computer Crime and Intellectual
  Property Section
1301 New York Avenue, NW,
Suite 600
Washington, D.C.  20005

CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by filing said document in the CF/ECF system which automatically sends a copy to the attorneys of record:

This 15th day of February, 2011.

*S/Brian M. Pearce*

BRIAN M. PEARCE
ASSISTANT UNITED STATES ATTORNEY